**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
London Division**

| | |
|---|---|
| IN RE:<br><br>**PACER MANAGEMENT OF KENTUCKY, LLC, et al.,**<br><br>                **Debtors**<br><br>**KNOX COUNTY, KENTUCKY, et al.,**<br><br>                **Plaintiffs,**<br><br>vs.<br><br>**PACER HEALTH MANAGEMENT CORPORATION OF KENTUCKY, et al.,**<br><br>                **Defendants.** | **Chapter 11**<br>**Case No. 12-60410 Jointly Administered**<br>**Judge Tracey N. Wise**<br><br><br><br><br><br>**Adversary No. 12-6016** |

**MEMORANDUM OPINION**

This matter is before the Court on the cross motions [AP Docs. 20, 21 & 27][1] for summary judgment with respect to the counterclaim [AP Doc. 15] filed by Pacer Management of Kentucky, LLC, Pacer Health Management Corporation of Kentucky, and Cumberland-Pacer, LLC (collectively "Debtors") for declaratory and injunctive relief against Knox County, Kentucky ("County"), and Knox Hospital Corporation ("KHC", together with the County, the "Knox Parties"). A hearing was held on January 17, 2013, and the motions were taken under submission.

Upon consideration of the arguments of counsel, the cross motions, responses, briefs, all exhibits filed herein, and the record in this case, the Court finds that there are no genuine issues of material fact and the Knox Parties are entitled to judgment as a matter of law.

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b), and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E) and (O).  The following constitutes the

---

[1] References to the docket in this Adversary Proceeding appear as (AP Doc. ___).  References to the docket in the main bankruptcy case referred to below appear as (Bk. Doc. ___).

Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a) and FED. R. BANKR. P. 7056. Only disputes over facts which might affect the outcome of the suit under applicable law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this regard, the moving party carries the burden of showing there is an absence of evidence to support a claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Where both parties have moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## FACTS

On March 27, 2012, the Debtors filed Chapter 11 petitions for bankruptcy under Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("Bankruptcy Code"). The cases are being jointly administered under Case No. 12-60410.

Prior to filing their petitions, the Debtors leased and operated the Knox County Hospital ("Hospital") pursuant to a Hospital Operating Lease Agreement ("Lease") with the Knox Parties. During the course of the bankruptcy, the Debtors rejected the Lease. A dispute arose between the parties with respect to the provisions of the Lease governing ownership of certain assets upon termination of the Lease. To resolve the dispute, the parties entered into a Settlement Agreement and Releases ("Agreement") dated July 24, 2012 [Bk. Docs. 238 & 241]. The Agreement was approved by the Court on August 10, 2012 [Bk. Doc. 249].[2] Under the

---

[2] The Agreement was amended by an Agreed Order [Bk Doc. 295]. The amendment is not relevant to this adversary proceeding.

2

Agreement the Knox Parties assumed control of the Hospital on July 16, 2012, at 12:01 a.m. ("Transition Date").

Contrary to its purpose, the Agreement failed to resolve the parties' arguments as to their respective entitlements to one asset related to the Hospital's operation. In particular, the parties request that the Court determine the ownership of significant funds that will be paid to the Hospital by the Kentucky Cabinet for Health and Family Services, Department of Medicaid Services ("Department'). The payment at issue is commonly referred to as a Disproportionate Share Hospital Program payment ("DSH Payment"). Generally, a DSH Payment is made annually to a qualifying hospital that has served a disproportionate share of indigent patients in the preceding year. The DSH Payment is in addition to the normal Medicare/Medicaid reimbursements paid to hospitals under titles XVIII and XIX of the Social Security Act. *See* 42 U.S.C. §§ 1395, *et seq.* (Medicare program) and 42 U.S.C. §§ 1396*, et seq.* (Medicaid program). "Congress [has] determined that hospitals that serve[] a disproportionately large number of low-income patients incur[] greater costs that [are] not met by the [normal Medicare/Medicaid reimbursements]." *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1262 (9th Cir. 1996). Data regarding the Medicare and Medicaid services provided by a hospital during the prior year, is used in making the calculations to determine the eligibility of that hospital to receive DSH Payments and the amount of such payments. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).

In this case, the Hospital's DSH Payment at issue (for Federal Fiscal Year 2013) is approximately $466,543 ("2013 DSH Payment"). The 2013 DSH Payment is calculated based, in part, on indigent care data for the period July 1, 2011 through June 30, 2012. The Debtors operated the Hospital during this period and for 15 days thereafter.[3] Although DSH Payments

---

[3] The Knox Parties concede that the Debtors are entitled to receive the portion of the 2013 DSH Payment for the 15 days during which the Debtors operated the Hospital. As such, this decision has no bearing on that portion of the 2013 DSH Payment which, by concession, is part of the Debtors' bankruptcy estates.

3

are received annually, the Agreement does not expressly address entitlement to the 2013 DSH Payment which the parties expected to be paid in the fall of 2012.

With respect to the division of cash assets that the parties anticipated would be received by the Hospital after the Knox Parties took over its operation, the Agreement provides:

> b. …Debtors shall have and retain exclusive ownership of any and all rebates, refunds, incentive or similar payments which were earned or which accrued but were not paid prior to the Transition Date, *provided however that this provision shall not include any credit for underpayment of Medicare/Medicaid reimbursements*, if any.

Agreement ¶ 4.b. (emphasis added).   The Agreement further provides:

> c.  Debtors shall have exclusive ownership of all accounts receivable from all Medicare/Medicaid payors existing or to be generated for services provided prior to the Transition Date.

Agreement ¶ 4.c.

Finally, the Agreement provides for the transfer and assignment by the Debtors to KHC of all Medicare/Medicaid provider agreements, provider numbers, licenses, certificates of need and other permits under which the Debtors operated the Hospital.   In connection therewith, the Knox Parties:

> 3.  …acknowledge that the transfer of such provider agreements in this case includes the transfer of liability for overpayments made to the Debtors in connection with such provider agreements.   The Knox County Parties agree that they will not seek to have the U.S. Department of Health and Human Services or the Commonwealth of Kentucky take action to recoup or setoff liabilities under the provider agreements against any accounts receivable retained by the Debtors under this Agreement.

Agreement ¶ 3.

The Debtors argue that the 2013 DSH Payment is property of their bankruptcy estates because it is calculated based on data from the period during which they operated the Hospital; thus, they claim, the 2013 DSH Payment is either a refund or rebate earned or accrued by Debtors pursuant to paragraph 4 of the Agreement.[4]

---

[4]  At the hearing, Debtors conceded that the 2013 DSH Payment was not an incentive.

4

The Knox Parties contend that DSH Payments are prospective payments intended to subsidize the Hospital's operations during the fiscal year in which the payments are made. Essentially, the Knox Parties argue that the 2013 DSH Payment is an advance for expenses to be incurred after the Transition Date.

**LAW AND ANALYSIS**

It is necessary to analyze the nature of DSH payments and then analyze the parties' Agreement to determine the parties' respective entitlement to the 2013 DSH Payment.

A.    Just What Is a DSH Payment?

The United States Court of Appeals for the Sixth Circuit has analyzed the purpose and nature of DSH Payments and has determined them to be additions or supplements to Medicare reimbursements. *See Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 275 (6th Cir. 1994) ("[T]he overarching intent of Congress" in adopting the disproportionate share program was to provide and supplement the resources available to those hospitals serving low-income persons); *Clark Reg'l Med. Ctr. v. U.S. Dept. of Health & Human Servs.*, 314 F.3d 241, 242-43 (6th Cir. 2002) (DSH Payments are supplements or additions to Medicare reimbursements); *see also Legacy Emanuel Hosp. & Health Ctr. v. Shalala,* 97 F.3d 1261, 1265 (9th Cir. 1996) ("Congress's overarching intent in passing the disproportionate share provision was to supplement the prospective payment system payments of hospitals serving 'low income' persons.") (citing and quoting *Jewish Hosp*, 19 F.3d at 275). The Ninth Circuit's analysis of the character of DSH Payments is consistent with the Sixth Circuit's.

> Congress found that providing services to low-income patients may cost medical centers more than is provided for by this scheme [Medicare/Medicaid system] and, accordingly, Congress directed the Secretary to make additional payments to hospitals that serve a significantly disproportionate number of low income patients.

*Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1093-94 (9th Cir. 2005) (quotations omitted).

Against this background, the Court turns to analyzing the parties' Agreement.

5

B.     <u>Interpretation and Analysis of the Agreement</u>.

An agreement settling claims is "essentially a contract subject to the rules of contract interpretation." *Cantrell Supply Co. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002). "Such an agreement is valid if it satisfies the requirements generally associated with contracts, including an offer and acceptance, full and complete terms, and mutual concessions of opposing claims." *McKim v. Newmarket Tech., Inc.*, No. 3:07-CV-337-H, 2008 WL 754739, *4 (W.D. Ky. Mar. 18, 2008). Neither party suggests that the Agreement is not valid and both parties agree it is not ambiguous.

> The primary object in construing a contract or compromise settlement agreement is to effectuate the intentions of the parties. Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.
>
> Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties. Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence. A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations. The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms. Generally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts and is subject to *de novo* review. However, once a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder.

*Cantrell Supply, Inc.,* 94 S.W.3d at 384-85 (citations and quotations omitted). Basic contract law provides that in the absence of an ambiguity, "a court will interpret the contract's meaning by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).

The Court agrees with the parties and finds that there is no ambiguity in the Agreement. It is not susceptible to different or inconsistent interpretations. The parties' intent can be determined from the four corners of the document. With one exception, the Agreement as a whole indicates the clear intent of the parties to draw a bright line—the Transition Date—to

6

establish ownership of the Hospital's cash and cash receipts. The Court finds that it was the parties' intent to allocate receipts for services rendered and liabilities for expenses incurred before the Transition Date to the Debtors, with the exception; however, that any benefit or burden of Medicare/Medicaid adjustments is reserved for the Knox Parties. As set forth above, paragraph 4.b. of the Agreement expressly excepts from the Debtors' pre-Transition Date entitlement "any credit for underpayment of Medicare/Medicaid reimbursements." Similarly, in paragraph 3, the Knox Parties agreed they would bear the burden of any overpayment to the Debtors from Medicare/Medicaid and "would not seek to have [Medicare/Medicaid] take action to recoup or setoff liabilities under the provider agreements against accounts receivable retained by the Debtors."

The Sixth Circuit's determination that DSH Payments are supplements to Medicare payments is binding on this Court. The Debtors' entitlement to payments made after the Transition Date is limited to receipts that arise directly from services rendered. That data from Debtors' pre-Transition Date services is utilized in the calculation of the post-Transition Date 2013 DSH Payment does not make them "accounts receivable….for services provided prior to the Transition Date" (Agreement ¶ 4.c.) or a rebate, refund or similar payment "earned or which accrued ... prior to the Transition Date" (Agreement ¶ 4.b.).[5] Moreover, in their joint response and cross-motion for summary judgment, Debtors contend that the 2013 DSH Payment "is essentially an adjustment of earlier estimated payments" received through the Medicare/Medicaid system. [AP Doc. 27 at 2]. Thus, the payments are not "accounts receivable from all

---

[5] Debtors' reliance on *In re CHA Hawaii, LLC*, 426 B.R. 828, 834 (Bankr. D. Haw. 2010) is misplaced. In *CHA Hawaii*, the bankruptcy court analyzed whether DSH Payments received by the debtor were a secured creditor's cash collateral under the terms of the security agreement between the debtor and creditor. The creditor agreed its collateral did not include "accounts", and further agreed "accounts" included regular Medicare/Medicaid reimbursements. Finding that DSH Payments are supplements to Medicare/Medicaid reimbursements, the *CHA Hawaii* court held the security agreement's exclusion of "accounts" likewise excluded DSH Payments. *Id.* Debtors fail to explain how the interpretation of the security agreement in *CHA Hawaii* is relevant to an interpretation of the Agreement herein.

Medicare/Medicaid payors ... for services provided" to which the Debtors are entitled pursuant to paragraph 4.c. of the Agreement.

Congress has acknowledged that hospitals serving low-income persons are underpaid by the Medicare/Medicaid reimbursement system. *Portland Adventist Med. Ctr.*, 399 F.3d at 1093-94. The DSH Payment program was adopted by Congress "to ensure the continued operation of these facilities for the benefit of those persons who have no other health care alternative." *Jewish Hosp.*, 19 F.3d at 275. It was the clear intent of the parties to provide the Debtors with cash and receipts attributable to the Hospital's pre-Transition Date operations and to provide the Knox Parties with the benefits/burdens of the transfer of the provider numbers and continued operations of the Hospital, including the benefits/burdens which flowed from adjustments to the Medicare/Medicaid reimbursement/recoupment program.

## CONCLUSION

The Court finds that the DSH Payment is an "underpayment of Medicare/Medicaid reimbursements" and is specifically excluded from the cash assets of the Debtors by the Agreement. The Knox Parties have demonstrated that they are entitled to judgment as a matter of law and their motion for partial summary judgment [Doc. 20] will be granted and the Debtors' cross-motion for summary judgment [Doc. 27] will be denied. A Judgment Order in conformity with this Memorandum Opinion will be entered separately.

**COPIES TO:**
Mary L. Fullington, Esq.
Dean A. Langdon, Esq.
Douglas McSwain, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge
Dated: Wednesday, March 27, 2013
(tnw)**